Please step up and announce yourselves. Good morning, Your Honor. Charles Hoffman, representing James Degorski. Good morning, Your Honor. Assistant State's Attorney Alan Spellberg, representing the people of the state of Illinois. And you know our General, so we aren't real tight, but that doesn't mean go forever. But secondly, if we do ask a lot of questions, we'll give you some additional time. And with that, go ahead. Thank you. Good morning, Your Honors. Again, Charles Hoffman, representing James Degorski. I'd like to reserve a few minutes for rebuttal, if I may. We've raised two issues in our brief. Today, I plan on addressing the first issue, and I'll try and answer any questions the Court might have on either issue. That first issue is that James Degorski was deprived of a fair jury trial when former Assistant State's Attorney Mike McHale, who took Degorski's confession, told the jurors that Degorski's confession was reliable and he believed it. As the Court knows, this case involves the murder of seven people at a Brown's Chicken restaurant in Palatine, Illinois, on January 8, 1993. That crime went unsolved for almost a decade. Ultimately, Juan Luna and James Degorski were arrested, they were tried separately, and they were convicted. Luna had confessed, and DNA and palm print evidence tied him to the crime scene. Like Luna, Degorski also confessed. But unlike Luna, there was absolutely no forensic evidence tying him to this crime scene, and there was very little other probative evidence of his guilt. I think it's fair to say that the jury's verdict in this case hinged on one question. Were James Degorski's confessions true, or were they false? The defense theory was that Degorski's confessions were false, and that Luna committed this crime with an unknown accomplice. This defense theory was completely undermined by the improper opinion testimony of State's witness Michael McHale. As I said, McHale was the Assistant State's Attorney who took Degorski's confession, and he told the jurors that that confession was reliable and that he, McHale, believed it. And that prejudice was magnified because the jurors were also informed, over objection, that former ASA McHale had ascended to the bench and was now a Cook County Circuit Judge. But now, wasn't this question more or less induced? I mean, the way it was asked, you gave the State's Attorney clear opportunity to embellish and maybe do a little showboating, but it was induced, so it's like, you give me the chance, I can take it. I don't think that's the case in this case, Judge Fitzgerald-Smith. The State says these answers were in direct response to counsel's questions. That's not true. Defense counsel was attempting to establish the objective indicators of what makes a confession reliable or unreliable, so that the jurors could determine if those indicators applied to Mr. Degorski's confession. Go ahead. I saw that in your brief, and it was actually pretty compelling as I was reading it in the brief, because it did seem, taken in the context that you put it in the brief, that the witness was overwhelmed by the spirit of volunteerism to let him know that it was, yeah, yeah, I found it, you asked me if it was reliable, I found it reliable. But then when you read the record, when you read the transcript, it's after 20 pages of hammering at him, trying to get him to, you know, get a little bit excited on the witness stand, and I think the cross-examiner brought up the word reliable, reliable, reliable over and over and over, and it did seem like it was an invited response. Well, I think it's important. I don't think you can find it's invited just because this happened on cross, and I think there's a couple things we need to take into account to determine if this was actually invited. First, the context of the cross-examination, and your Honor brought that up. The context of this, as I mentioned, the theory of defense was these confessions were false. Why were they false? Well, partly they were false because of the interrogation methods used by the task force members, the police in this case, the aggressive interrogation methods, which included feeding information to persons being interrogated and showing them documents and photographs while they were being interrogated. But this witness here, Mr. McHale, you're not saying that the way he, quote, interrogated was oppressive. No, absolutely not. He talked to him for about five minutes and then left and went to bed for a while. Well, that was before there were the detailed confessions. No, we're not claiming that Judge McHale used any improper interrogation methods. Here's what counsel was attempting to establish during cross-examination of him. First, she established that his objective in questioning Dvorsky, as with any custodial suspect, was to get a statement that was reliable and truthful. That was the objective. She also established it was McHale's standard practice to ask a person being interrogated whether the police had shown him any reports or diagrams or photographs. And then she established, through McHale, that McHale never asked Dvorsky if the police had shown him any photographs or diagrams. And I think this is the key, Justice Lavin, having established those facts, those three facts that I just mentioned, which were entirely proper and which were to support the defense theory of innocence. Counsel asked McHale, those things would be important, wouldn't they? And McHale responded, I don't know what you mean. They would be important. What do you mean by that? And then here's the critical exchange. And it's at page 34 of our brief. Question. Well, when you talk about getting a statement that's reliable and truthful, you want a statement that is not contaminated by someone having information from outside. That's the defense theory. Here's the answer from McHale. I suppose that's true. That's the direct response to the question. That's what the question invited. But Judge McHale wasn't finished with his answer. He added gratuitously, but his statement to me was reliable. That was improper. Was there an objection? What troubles me, frankly, is that while it was indeed a volunteered statement quite clearly, he was, as Justice Lavin suggested, in broader context, subjected to a very pointed cross-examination beforehand. And the question that then arises in my mind is, in that context, when he's really just commenting on his feeling at that time and not talking about what the jury should do now, and when the response to the volunteered statement, if indeed it was volunteered, is continuing to emphasize it, which is what the defense lawyer did, it's kind of like trying for a gotcha. I mean, we have this thing where the response is followed by, that's your judgment? Answer, you got it, it sure is. Showing, I think, the frustration. Followed by, based on your time you spent with Mr. Degorski? Answer, based on a three-hour face-to-face conversation, he detailed about how he murdered seven people. Yes, and I believed him, counsel. So you want Mr. Degorski to be convicted? Answer, I don't. I want this jury to decide what the right thing to do is. I'm just telling you what happened, despite a lot of insinuations that you're making. I'm telling you what I did that night truthfully, and this is for the jury to decide. Now, in that context, the question is, even if this is volunteered, on two points. One, in the context of what happens in the cross-examination, is it error? And if so, why is it emphasized over by the defense attorney, who continues to bring out, once they've heard this statement, that this is his opinion? And then, on top of that, even if it's error under these circumstances, in the context of the statement by the witness that this was his opinion at the time, essentially, and he wants the jury to decide, what is the harm under these circumstances? Well, first of all, Justice Epstein, you mentioned the word gotcha. I think there was a gotcha here, but I don't think it was by the defense counsel. I think it was by Judge McHale, and the harm, I think, is obvious. Was it used by the prosecution thereafter? Well, I'll tell you what the prosecution used. Number one, in rebuttal closing argument, when defense counsel wasn't able to, again, address the jury, they, again, referred to the witness as Judge McHale. But even more importantly — I'm talking about the — I understand that's sort of like a related but separate issue. Did they say that he believed him? Here's what they did. They almost got there, Justice Epstein. I think they did it in a little more subtle way. What the prosecutor said in rebuttal was Mike McHale spent three hours face-to-face with the defendant, three hours face-to-face. If you spend three hours face-to-face with someone, you get a pretty good picture. That's almost word-for-word why Judge McHale told the jury he believed the Gorski's confession. So he didn't outright say — you heard Mike McHale say that he believed the defendant's confession, but he came awfully close in rebuttal. He reminded them of why Judge McHale thought it was believable. If this is a problem, if this is an error at trial, the lawyer can object, right? Yes. The lawyer could object and say the answer is not responsible. And instead what counsel did in the very next question after what my colleague just quoted said, Mr. McHale, you just felt the need to give us your opinion about whether Mr. Gorski's statement to you and then the State objects overruled. The trial court there, if this is a significant enough problem, the trial court is there to hear the objection and perhaps to strike the testimony, but it seems like it's the defense that really wants to keep hammering at this instead of objecting, instead of trying to get relief. Okay. First of all, the question and answer you just read came after McHale had already said it was reliable and I believe him. Understood. Okay. So the first thing that comes out without any improper questioning or inviting is the statement was reliable. I think what happened was defense counsel went into damage control mode at that point. That's your judgment? By pouring kerosene on the fire? Well, it had already come out, Justice Epstein, that this witness told the jurors that he thought the statement was reliable. So I think counsel in the heat of the moment made a choice. In the moment applies to both the person asking the question and the person responding to the question. Absolutely true. And what counsel did, which probably wasn't the best thing in the world, was get the witness to reaffirm that he thought the statement was reliable. It had already come out. She said, that's your judgment? You got it. It sure is. Based on your time you spent with Mr. Degorski, this is what counsel invited by that question. Based on a three-hour face-to-face conversation where he detailed how he murdered people, seven people, yes. Okay. He's reaffirming what he already testified to. Responding to the invitation to do exactly that and to elaborate on why he had that opinion at the time. We're not complaining about the answer I just read. But then he gratuitously added, and I believed him. She never asked him, did you believe it? She never asked him that. It came out. Well, she reaffirmed it beforehand. She reaffirmed that it was reliable. But I think, right, it's the heat of cross-examination. Obviously, tempers were rising. We saw Justice McHale later on claim that there were insinuations made. But I think the key here is, even if counsel made a misstep, first of all, we don't think it's invited. We think he gratuitously added what we're complaining about. But even if it was invited, even if defense counsel made a misstep, this wasn't some lay witness off the street. This wasn't some person who didn't know the rules of evidence. This was a 15-year veteran of the Cook County State's Attorney's Office testifying in a capital murder trial. This is a man who had become a sitting judge in Cook County. He knew better than that, Justice Epstein. I mean, he wasn't personally under attack. He wasn't about to be beat up. He was a witness on the witness stand. If he knew better, and I'll accept that for the moment, so did the defense lawyer. So did the defense lawyer. The court is sitting right there to grant relief if this is such a problem. Well, I think it was such a problem, Justice Lavin, that an objection would not have done any good. The decisive question in this case was whether or not James Degorski's confessions were true and reliable. His guilt, if not his very life, depended on that question, and the jurors knew this. But are we really, Mr. Hoffman, ignoring the fact that the position of the trial, everyone knew that that was the issue in the trial. The jury knew it from opening statements all the way through to the closing arguments. And they knew that all of the people who were prosecuting the case, the police officers who testified for the state, and the assistant state's attorney who had become a judge, took the position by the fact that they were there and testifying in this case that this was their view of the confession, that it was accurate, that it was reliable, and that they want the jury to decide that it was so, because that's why this case is being prosecuted. Correct. What we're really talking about are a few words that expressly said what everybody in the courtroom, including the jury, knew was the position of everyone involved in the case from the prosecution point of view, just as they knew that from the defense point of view, that was not a truthful statement, because it was made clear at the beginning of the case. The state's attorney in opening statement says you have his confession. Implication clear? Rely on that. Convict on that, because that's what the evidence is. The defense says don't believe it for a variety of reasons. And what you're really saying is somehow the express statement that this witness believed it was such a big thumb on the scale that it created a whole different impression than the jury had from the beginning of the trial all the way through. That's not just my view, Justice Epstein. It's also this court's view in the cases that we rely on. In People v. Me Knows, this court found plain error where a police officer testified that he didn't believe the defendant ever told him the truth while he was being interrogated. This court held that was plain error. There's a difference between the advocates in a case taking a position based on the evidence. The prosecutor couldn't have argued in closing argument. It's my opinion that James Degorski's confessions were true or false. And also, Justice Epstein, these jurors also knew that defense counsel wasn't present for the confession. And they knew that the prosecutor wasn't present for the confession. But they were told that Judge McHale was present for the confession. In fact, he took the confession. But Me Knows, the case you talked about, was on its facts rather different in the sense that in that case, the detective repeatedly testified that he had told the defendant during the course of interrogation, I don't believe you. I don't believe you. I don't believe you. But that wasn't the error, Justice Epstein. This court said that was not erroneous. That's where the Hansen case comes in that the state's relying on. If a witness, if a police officer testified, I'm interrogating a suspect. The suspect told me something. I said, I don't believe you. The suspect told me something else. And this is what happened in Me Knows on direct exam. I don't believe you. You changed your story. And the suspect changes his story again. And the officer says, I don't believe you. This court said, that's perfectly appropriate. That's a tactic of interrogation. That's the officer using his sequential logic to show how the defendant reacts. Go ahead. The problem in Me Knows came on redirect examination. Everything that you mentioned from Me Knows was perfectly proper. And that's also what happened in Hansen. The officer during an interrogation said, your sister says you're guilty. But in Me Knows on redirect examination, the interrogating officer only said this. I don't think that guy ever told me the truth that night. That was the error. That's what was improper. And isn't that a difference? I don't think now that that guy ever told me the truth that night. The response to the question was arguably, and the state argues this, his then impression during the course of the interrogation or the questioning at the time when he was being criticized for not doing things that would create a reliable confession, that at that time, in essence, he believed it. Right. Isn't that temporal difference a distinction? Even if it's a temporal distinction, I think you have to put yourself in the place of the jurors. If Judge McHale thought that Jim Degorski's confession was reliable and he believed it at the time he took the confession, these jurors were told nothing that his opinion had changed. If Degorski's confession was reliable and true then, it's still reliable and true. No, but it was his impression at that time, his belief at that time. Correct. But in any event, explain to me how this was a revelation to the jury, even if it was error, that Mr. McHale believed that at the time. I don't know if revelation is the right word. How does it matter then? I think it matters a great deal, and here's why. As I said, the defense lawyers tell the jurors the evidence will show the confession was false. The prosecutor says the evidence will show the confessions were true. This was improper testimony because it's what this court and other courts have condemned as human lie detector testimony. McHale told the jurors that he reached the opinion that the confession was reliable and he believed it, not based on some objective evidence that came before the jury, but he said, yeah, I sat there, I talked to the guy for three hours, I concluded based on face-to-face conversation with him where he detailed how he killed these people, yeah, it was reliable and I believed it. That's improper because it's his opinion testimony. He is saying to the jurors, basically, I'm a 15-year veteran of the Cook County State's Attorney's Office. I worked felony review, cold cases. I'm now a sitting judge. I interviewed this guy for three hours, face-to-face. I concluded what he told me was reliable and I believed it. That's entirely improper, and here's why. The jurors know what defense counsel and prosecutor's role is. They also know what the role of the witness is. Here comes a judge who says the defendant's confession is reliable and I believed it. These jurors must have been incredibly relieved to hear that, and that's the prejudice, Justice Epstein, because, as you said, they know the key question in this case is, is his confession true or false? This is a death penalty case. They know his guilt and his life depend on that, and Judge McHale comes in and tells them, believe it. They must have thought, gee, I wasn't there. I don't know what he was saying. I understand the hyperbole in that last statement, but he didn't say believe it. He said quite expressly to the jury, or in answer to the question, that the jury should evaluate and the jury should decide. He said, I want this jury to decide what the right thing to do is. Yeah. Don't we all? Yes, absolutely, Judge Epstein, but if Degorski's confession is true and it's reliable, the right thing to do is to convict him. So basically what Judge McHale said by that statement was, I don't think that cleaned up what happened. I think it, you know, I want this jury to do the right thing. Oh, by the way, his confession's reliable and I believed it. I don't think that cures anything or lessens it. Obviously, it's up to the jury, but if I'm a juror in a capital case and I hear a judge come in, a judge who took the defendant's confession, tell me it's reliable and he believed it, and excuse me if it's hyperbole, but there are lines of cases that talk about errors that lessen a juror's sense of responsibility. Gee, I wasn't there. I don't know if Degorski's confession is true or false, but Judge McHale was there. He took it. He said it's reliable and he believed it. Who am I to disagree with this judicial figure? And we've cited cases, Willis from this court, judges' position is one of great authority and influence, and it cites several cases for the proposition that a judge's testimony may therefore be given undue weight by jurors. And that's the case where it was repeatedly referred to Judge Teelander as a judge during the questioning and multiple times during the closing argument, isn't it? No, I believe this was, which judge was this? I can't remember. This was a 26th Street case. I'm sorry. I confused the name of the case. Where they called the judge to testify. The judge had presided at the defendant's first trial, and he actually granted the defendant a new trial. And what happened was they brought the judge in to testify about what happened at the first trial, basically reading transcripts. So all that judge did in that case was read transcripts from the first case. But I think the point is the difference obviously there is he was completely unnecessary to have the judge be the one to read the case. Correct. Any human being could have read the case. And we're not citing that case for its holding. We're just citing it for the proposition that when judges who are held in very high esteem by the society, and I'm not trying to be flattery. I'm just saying what the case law is. We should read our mail, incidentally. We cited a D.C. Circuit case. Because of the position and authority of judges, there's considerable risk that a jury will court a judge's testimony substantially greater weight than it deserves. There's the danger. There's the answer to your question. How is this prejudicial? Because he was a judge who took a defendant's confession in a murder case and told the jurors that the confession was reliable and he believed it. The key witness on the decisive question in the case. And I think it's extremely important for this court to consider that was the case.  The state has, in its brief, recounted evidence that they think makes it absolutely overwhelming. We disagree. I think the other evidence was so weak that it probably wouldn't have supported the conviction. Do you have some other arguments? Not that I planned on making. But if this court has any questions on Issue 2, I'll be happy to answer. Otherwise, I thank the court for its time. And we would ask this court to find that Jim Degorski's trial was rendered unfair by Judge McHale's improper testimony and ask this court to grant him a new trial. Thank you, Mr. Hoffman. Thank you. Good morning again. Assistant State's Attorney Alan Spellberg representing the people. I just first would like to apologize to the court. As I was preparing for oral argument and rereading my brief, I found numerous typos throughout the brief. So I apologize for not providing a fully complete and professional product to the court. But having said that, going directly to the defendant's arguments, it is clear from the record that the entire context of the cross-examination of Mr. McHale was to establish that he was trying to obtain a, quote, truthful and reliable statement from Mr. Degorski. As quoted on my brief on page 34, on page 7980 of the record, the defense counsel asked Mr. McHale if he agreed that it was important that the statement be reliable after Mr. McHale stated that he did. This was the precise question which started the entire colloquy at issue here. Now, you want from any suspect, but let's just talk about Jim Degorski here for a second. You want a statement from him that was truthful. The answer, if he was willing to give me a statement, of course, I want it to be truthful. I went there to see if he was willing to talk to me and give me a statement. That was my job. So clearly, the goal of the defense attorney was trying to establish that Mr. McHale took a statement which he believed to be truthful, but they were going to establish was not. That was the entire context of the cross. Well, I think that that's an interesting spin, and I understand as an advocate why you're saying it. But basically what it was was holding up best practices as a model to the jury and then showing how this questioning did not comport with best practices, which they argue and plan to argue would undercut the believability of the statement. And that's what really this was all about. The question is how thick a skin after 20 minutes or so of questioning the witness had and whether that got under his skin and caused him to volunteer something that he shouldn't have said, which is why we're here today. Absolutely, Your Honor. And I understand. And just taking one step back briefly, in terms of a cross-examination designated towards best practices, certainly that's appropriate. The problem here was that the cross-examination went from general concepts of best practices to precisely the interrogation, the interview that occurred in this case. Were you taking a truthful statement from Jim Degorski? And so that's what changed the tenor, and it became about the precise actions that occurred in this case. But getting more to your point, and I appreciate the fact that it's the question of whether or not that ultimate answer is a problem. But what my colleague didn't say at all, and what he failed to even acknowledge really in his brief at all, is that this is a question for the trial courts. There was an extensive mistrial motion based upon this. The trial judge, after hearing the motion, made the determination that it was within the context of the closing of the cross-examination and that it didn't require a manifest necessity of mistrial, that it didn't demonstrate undue prejudice to the defendant given everything that occurred. And the importance of that fact, the fact that there was a mistrial motion, is that that was the finding which has to be given extreme deference by this court. The Illinois Supreme Court, the United States Supreme Court, has said that rulings on mistrials are given very high levels of deference. It is an abuse of discretion standard. Now, Mr. Hoffman's brief suggests that it should be not an abuse of discretion standard just because he considers this to be a violation of established law. I believe that's his response in regards to his argument for whether or not Mr. McHale could be identified as a judge at all, as opposed to the answer to the question on cross-examination. We disagree with that, obviously. The proper standard review for evidentiary issues is abuse of discretion. That has always been the standard in regards. What Mr. Hoffman is arguing now is that despite what the Jordan case says, despite what the Grissett case says, which he relies on, which found it was not an abuse of discretion in that case either, that the question of whether or not any witness should be allowed to identify on direct examination what their occupation is, is a matter of law, is inappropriate. He then goes on to say, but of course many people do it,  So it would seem to be that he's acknowledging that its relevance exists in just about every case, but that sometimes the prejudice outweighs the relevance, the probative value. That's a question of discretion for the judge to sit there and make that determination, that balancing between probative value and prejudice. So I don't really see how this could be anything other than an abuse of discretion standard, especially since, in this case, Judge Gawne was presented with the Jordan case, was presented with the argument by defense, made a reasoned determination and directed the parties that Mr. McHale could be identified as a judge, but that he wouldn't be walking in with a robe or being referred to as Your Honor in any way. And that's exactly what happened here. So this was a proper exercise of discretion at the beginning of the trial in terms of allowing Mr. McHale to be identified as a judge, because it goes to his overall credibility and context as to who he is, and the jury can then establish and assess who he is and whether or not he should be given any weight as a witness. And then the abuse of discretion standard carries on, most importantly, for the mistrial motion, because that was the ruling that Judge Gawne was able to make after considering everything, could assess the effect of the questioning and the answer upon the jury and made a determination. And that's what's supposed to be so highly deferential to him at this point. Just a couple of other points about this. In terms of a question, Mr. McHale immediately discounted any assertion that he was asking the jury to find him guilty based upon his personal belief. That did not happen at all. And even though a defense attorney kept pushing him, asking him to give that opinion, finally Judge Gawne had to stop her and say that's not an appropriate question. Mr. McHale never gave a present opinion as in the Hansen case, which is very much unlike the Munoz case, unlike the Crump case, and very much like the Chabon case that we cited in additional authority. And finally, this is a case where if any error has been negated by the jury instructions, not just telling the jury that they are the sole arbiters of the believability of the witness, but also based upon your question, I would just point out the jury was also told the mere fact that he's been charged and that the state has charged him with a crime is not to factor into their determination whether or not he's been guilty. Did Mr. Degorski ever give a prior consistent statement to anybody? Implicating himself? There were numerous statements in this case. That was my next point I was about to make. He gave multiple statements. He gave statements at the time of the crime essentially to Eileen Bacala and Ann Lockett. He gave statements to Commander King from the Pale Time Police Department, a very lengthy statement which was really the crux of the case, the most important confession in this case. He gave an implied statement to Walter Hanger after the investigation had turned towards him and he had already given a DNA swab. And then after he'd been arrested, he acknowledged to Alicia Hines at the Cook County Jail that he did it for fun. And all of that evidence was before the jury. They were able to consider not just Mr. McHale's testimony in the statement, which the defendant gave to him, but all of those statements. And then on top of that, within those statements, the assertions and the recognitions by Ann Lockett and Eileen Bacala that Juan Luna was James Degorski's best friend, that they spent all their time together. There was no dispute at all that the physical evidence linked Juan Luna to this crime, his DNA, his palm print at the crime scene. And then also, finally, the existence of the gun, the gun which was described prior to the murders happening as being in possession of James Degorski and then never seen again, which was shown to be, that type of gun was shown to be consistent with the physical evidence that existed that killed the seven victims at the Brown's Chicken on that night. And so for those reasons, we would ask this Court to reject the defendant's arguments and affirm his convictions for the murder of seven people. Thank you. There were prior admissions by Mr. Degorski, and the defense theory was that that was simply false bragging. But I think the point which we tried to make in our briefs was, if his confession to Commander King and to McHale were true and reliable, then of course they all were reliable. I mean, either Mr. Degorski did this crime or he didn't. What about Lockett? What about his girlfriend? Lockett and Bacala. Darn near contemporaneous. Darn near contemporaneous. The defense theory was, this was false bragging to impress these girls, and it was based on information that he got from Juan Luna. I understand. But the argument that you're making here vis-à-vis Judge McHale's testimony is that it was really improper because the jury was deciding just whether or not the confession he gave to McHale was reliable, and what he said to the police was reliable. Right. Well, he had said it ten years, however many years earlier, to his girlfriend. Right. And if what he said to McHale was true, then what he said to the girlfriends was true. If what he said to McHale was false, then what he said to the girlfriends was false. Like I say, he either did this crime or he didn't. Of course, our issue would be stronger had he not made those statements, but our argument is, I don't, if you read our briefs, you see the problems those two witnesses had, Lockett and Bacala. I don't have time to get into that as to how reliable, after ten years, were they testified. Their memories were blurry at that time. They couldn't remember who said what, whether Luna said something or whether Degorski said something. Lockett had some pretty severe drug problems. Be that as it may, what I want to urge this Court not to do is to hold that aggressive cross-examination excuses improper prejudicial testimony. This was a very tough cross-examination. I don't think we want to send a message to trial defense counsels, don't be too aggressive in your cross-examination on best practices because you might open the door. I'm not disputing that. I'm really troubled by the invitation to reiterate it over and over again and to even go further that was made by the defense attorney after the clause that you complain of. Correct. That's troubling. He said reliable before she did any of that and then he added and I believed it. So it isn't as though he kept saying reliable, reliable, reliable. I believe it is an even more egregious statement. And, you know, where do we draw the line on tough cross-examinations? What if defense counsel is trying to Well, I'm a big believer in tough cross-examinations and there are times when you have to ask yourself is it time now to ask for curative instruction or are we going to keep highlighting the answer which we will later claim is a reason for a new trial? But as you said to my opponent, Justice Epstein, this was about best practices. She was trying to establish that he didn't ask the Gorski if the police had fed him any information and he even conceded, well, it's probably true that I should have done that. That should have been the end of it. Had he only said that, had he only said that and then not added, but I didn't do my best practices because, hey, his confession was reliable. Why do I need to do that? That's what started this whole thing. Up until that point there was no error. There was no invited error. There was no uninvited error. Once he gratuitously added and it was reliable, that set it in motion. Maybe defense counsel made it worse, but I think if all that happened was that he said it was reliable, I think we'd still be here and I think we still would have raised this issue because, as I said, this was the key witness in a decisive question. And where do we draw the line on this? What if defense counsel is grilling a police officer? Well, isn't it usual to do a gun residue test? Well, yeah, usually, but we believe the guy when he told us he shot the victim. I mean, this could happen in any context. I guess my point there would be to argue very well, you know, this guy jumps to a conclusion and therefore he doesn't do what he should have done and that's why this isn't reliable. But that's an argument. I wouldn't necessarily suggest that the proper defense response to that would be to keep reiterating the damaging things that you're later going to rely upon. Well, let's say that defense counsel's actions made it more reversible, but it was reversible to begin with before that head-to-head started. And, again, I just urge this Court to consider, even in the heat of cross-examination, even if counsel made a misstep, this was not a lay person. This was a person very familiar with the rules of evidence. I think in order to provide James DeGorsey with a fair trial, regardless of how hot under the collar Judge McHale got, it would have been much better and it would not have caused this error had he just bit his tongue and not said. There's no question about that. And we're constantly presented with things that people shouldn't have said. And the question is, was it error? And, if so, was it harmless under the circumstances? And those are the questions that we have here today. Correct. And I think if Your Honors consider whether or not this was error, if you look at Henderson, Munoz, and Crump, you'll find it was error. If you consider whether it was harmless, I think you have to find that it was not harmless because the confession was the key evidence in the case. And, with that, I thank Your Honors for your time. Thank you both for a very well-presented argument and very well-written briefs.